T. W. George, John Wrather and Fred Wimberly, Partners Trading Under Firm Name of George and Wrather Drilling Company et al., Appellants, v. E. I. du Pont de Nemours and Company, Appellee.

Gen. No. 45,679.

Opinion filed December 8, 1952. Rehearing denied December 22, 1952. Released for publication December 23, 1952.

ECKERT, PETERSON & LEEMING, of Chicago, for appellants; WALTER W. ROSS, JR., HERBERT C. LOTH, JR., and TIMOTHY G. LOWRY, all of Chicago, of counsel.

POPE & BALLARD, of Chicago for appellee; FRANK F. FOWLE, JR., and GEOFFREY FLEMING, both of Chicago, of counsel.

MR. JUSTICE NIEMEYER delivered the opinion of the court.

Plaintiffs appeal from a judgment entered on a verdict for defendant directed at the close of plaintiffs' evidence in their action for damages resulting from defendant's alleged negligence in shooting plaintiffs' oil well in Wabash county, Illinois.

The amended complaint on which the case was tried alleges that pursuant to an oral agreement whereby defendant agreed to shoot plaintiffs' well, defendant placed in the well 20 quarts of nitroglycerin, a cave catcher and a time bomb allegedly set to explode the nitroglycerin at 11:40 a. m. the following day, September 28, 1947; that shortly before the time appointed for the explosion defendant set up its equipment for detecting the explosion near the well and shortly after 11:40 a. m. advised plaintiffs that the nitroglycerin had exploded, whereas in fact it had not exploded; that thereafter, at the direction of defendant, plaintiffs proceeded to drill the Cal-Seal (cement placed in the well above the nitroglycerin) from the well, and while so drilling the nitroglycerin exploded with the result that the drilling tools were shattered and the oil well irreparably damaged and destroyed.

In denying liability for the loss sustained by plaintiffs, defendant stated shortly after the occurrence that "All evidence, including that of Mr. Rowe (defendant's employee who checked the explosion)—the geophone indications and observations of others present at the time the shot was set to go, indicates that this shot went off at the appointed time." In its answer defendant admits that shortly after the appointed time for the explosion it advised plaintiffs that the nitroglycerin had exploded.

The purpose of shooting an oil well is to break down the strata and increase the production. Plaintiffs' well was in a field of producing wells in which there were three different production zones or pays. Defendant had successfully shot the two lower pays. This litiga-

tion arises from the attempt to shoot the well at the top pay, 1,770 to 1,784 feet below the surface. Defendant's employee Lacey, who placed the shot, was an experienced and capable shooter. The shot from bottom to top was made up as follows: A bridge placed about 40 feet below the pay; about 35 feet of Cal-Seal, which makes a cement when mixed with water; gravel; 20 quarts of nitroglycerin in a shell about 5 feet long; a time bomb, which Lacey said he had set for 11:40 a. m. the next day; an umbrella bridge or cave catcher, gravel, about 45 feet of Cal-Seal, and water to the top of the casing (20 pound iron pipe, 7 inches in diameter). Lacey placed the nitroglycerin and time bomb at the pay level. The other work was done under his direction.

The following morning at about 10:30, Rowe, defendant's checker, appeared at the well with a geophone—a very sensitive shock detector. Perry, a driller, and Pinkstaff, a tool dresser, employees of plaintiffs, were at the well. Shortly before the appointed time for the explosion, Rowe set up his instruments about 200 feet from the well. Perry and Pinkstaff went to the doghouse, a small building about 50 or 60 feet from the well, where they sit when not working. About 15 or 30 minutes after 11:40 a. m. Rowe came to Perry and Pinkstaff at the doghouse and said, "I hope the shot is off, but I don't know"; "The wind works on my instruments until I don't know—I hope it is off." In reference to drilling, he said, "I'd wait 30 minutes before running anything in the hole." Perry testified on cross-examination that he didn't know as much as Rowe did about shooting; that Rowe was in charge and whatever he said they would do; that Rowe thought the shot was over but wanted him to wait; he did not think it was strange at all. He, Perry, doubted that the shot went off, but

wasn't pretty sure about it—he just doubted. Rowe left the premises shortly after his talk with Perry. He said nothing about coming back. Perry testified that if there is a sleeper—a bomb the explosion of which is uncertain—they should come back to the well and check it; what is to be done when there is an unexploded charge of nitroglycerin would be up to defendant. After waiting 30 minutes Perry began swabbing out the water, leaving between 800 and 1,000 feet of water in the well. He then proceeded to clean out the Cal-Seal that had been placed above the nitroglycerin. This was done by dropping the drilling tools, weighing about 3,500 pounds, from a height about 3 feet above the Cal-Seal. Each operation removed an inch or less of the cement. He cleaned out about half of the 45 feet of Cal-Seal. At the end of his shift at 3 p. m. he turned the work over to Weger, a driller, and Moore, his assistant, telling them that they didn't know whether the shot was off—to watch that. Weger went through the Cal-Seal. There was an awful noise. When the shot went off the motor ran away. He pulled part of the tools out of the well. Weger testified that it was not his business to check the shot; all he knew was what Perry told him; when there is a sleeper they tell them to keep a careful watch on the hole. Nobody came from defendant to watch it; we drilled into the hole; that has always been the practice.

Runkle, assistant to the manager of defendant, was examined under section 60 of the Civil Practice Act [Jones Ill. Stats. Ann. 104.060]. He testified that he had charge of the shooting of oil wells in 1947; that the customary thing for a checker, if he was in doubt as to whether the shot had gone off, was to advise the shooter or the witness, or both; that he saw Rowe within an hour after he had checked plaintiffs' well; Rowe said he had checked the well but did not say anything about having any doubt as to whether the shot

had gone off. If Rowe had any doubt it was his duty to report it to the witness at that time; had he so reported, he, Runkle would either have gone to the well or called Lacey to find out what time they would be at approximately the area of the shot in the process of drilling. The purpose of going down to the well is purely for the protection of the customer and ourselves—seeing to the operation of the drilling. If he had been advised that the checker had any doubt he would have stopped the drilling at the point where the gravel was and sent a pump down to pull up some material for examination; then if the shot had not gone off he would have placed another bomb in the well, going through the process of Cal-Sealing the well again; he had placed bombs where the shot had gone off as a matter of precaution; that was very definitely the custom and usage at that time, where there was any doubt as to whether the shot had gone off. If the producer takes us back to the point at which we left it, it is our responsibility to see that the shot has gone off. When the checker or shooter tells me there is a sleeper, we go down to the well and stay there until we are definitely sure the bomb has fired.

■■ The trial court directed a verdict for defendant. In passing on defendant's motion the court should only examine the evidence favorable to plaintiffs. As said in *Hunter v. Troup,* 315 Ill. 293:

"A motion to instruct the jury to find for the defendant is in the nature of a demurrer to the evidence, and the rule is that the evidence so demurred to, in its aspect most favorable to the plaintiff, together with all reasonable inferences arising therefrom, must be taken most strongly in favor of the plaintiff. The evidence is not weighed, and all contradictory evidence or explanatory circumstances must be rejected. The question presented on such motion is whether there is any evidence fairly tending to prove the plaintiff's

500

declaration. In reviewing the action of the court of which complaint is made we do not weigh the evidence,—we can look only at that which is favorable to appellant. *Yess v. Yess*, 255 Ill. 414; *McCune v. Reynolds*, 288 id. 188; *Lloyd v. Rush*, 273 id. 489.''

The facts on which a verdict may be directed must not only be undisputed but must also be such that there can be no difference in the judgment of reasonable men as to the inference to be drawn from them. *Berg v. New York Cent. R. Co.*, 391 Ill. 52; *Merlo v. Public Service Co.*, 381 Ill. 300.

██ The basis of plaintiffs' action is the charge that shortly after the appointed time for the shot to go off defendant advised plaintiffs that the nitroglycerin had exploded, whereas in fact it had not exploded. Defendant admits in its answer that it did so advise plaintiffs at the time stated. Defendant now contends that plaintiffs ''proved conclusively that defendant's agent told their agents that he did not know whether the nitroglycerin had exploded'' and thereby waived any right they may have had to rely on the admission in the answer. In the view we take of the evidence it is unnecessary to decide the question of waiver raised by defendant. Defendant's contention as to the proofs made by plaintiffs can only be sustained if all evidence pertaining to Rowe, other than the statement relied on by defendant, is disregarded. There is no contradiction in the evidence as to what Rowe did or failed to do. Plaintiffs' witnesses testified that when Rowe came to the doghouse after the time set for the explosion had passed, he told Perry and Pinkstaff that he did not know whether the shot was off but that he hoped that it was. The evidence shows that Rowe failed to do anything required to be done by him if he was in doubt as to the explosion. He did not tell Runkle, his superior, to whom he re-

ported within an hour, that he had any doubt whether the shot had gone off. He left plaintiffs' premises with his instruments without giving cautionary instructions as to the drilling of the Cal-Seal. He did not tell plaintiffs that he or other employees of defendant would be back to supervise the drilling. His direction to proceed with the drilling or cleaning out the Cal-Seal in the well without giving any cautionary instructions is consistent with a decision by him that the shot had in fact exploded and cautionary measures were unnecessary. Perry so construed it. Perry did not see the geophone. He "just doubted" whether the shot had gone off. He testified that Rowe thought the shot was off but wanted him to wait half an hour; that Rowe was in charge and he, Perry, would do what Rowe told him to do. Under all facts and circumstances in evidence, including the well defined custom and usage in the business, the jury could reasonably conclude and find that Rowe had changed his mind as to the explosion and that the direction to drill was in effect advice that the shot had gone off. Independent of defendant's admission in the answer, the evidence raised an issue of fact as to whether defendant had advised plaintiffs that the shot had gone off. This issue could only be determined by the jury. The court should not have directed a verdict for defendant.

██ Before directing a verdict the court struck certain portions of the amended complaint on defendant's motion. The case must be remanded for a new trial. The remandment will be without prejudice to the rights of the parties to amend their pleadings. It is therefore unnecessary to determine the propriety of the court's action in striking parts of the complaint.

The judgment is reversed and the cause is remanded for a new trial.

*Judgment reversed and cause remanded.*

FRIEND, P. J. and BURKE, J., concur.